SIGNED.

Dated: November 01, 2007

_____
**JAMES M. MARLAR**
**U.S. Bankruptcy Judge**
_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>TURNER-DUNN HOMES, INC., and others,<br><br><br><br><br><br><br>Debtors. | Chapter 11<br><br>Case No. 4-06-bk-00961-JMM<br><br>(Jointly Administered With Case Nos.:<br>4-06-bk-00962-JMM; 4-06-bk-00963-JMM;<br>4-06-bk-00964-JMM; 4-06-bk-00965-JMM)<br><br>**MEMORANDUM DECISION**<br><br>**RE: SURCHARGE** |

Before the court is the Trustee's motion to surcharge the secured creditors against land sale proceeds of $29 million. The Trustee initially asked for $1 million, which is .03448% of the total. The Trustee sought this amount against all lienholders, but between then and now, settled with one of them, Ohio Savings Bank ("OSB"), for $240,000, and, in addition, the Trustee further reduced his claim by an additional $105,000. Thus, the Trustee now seeks to charge the remaining secured creditors the remaining sum of $655,000.[1]

The statute under which the Trustee seeks the surcharge against those creditors secured by the property is 11 U.S.C. § 506(c). The statute allows a surcharge, chargeable to those with allowed secured claims, for the "reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim . . . ."

In this case, there is no dispute that there are several creditors with allowed secured claims who stand to benefit from the Trustee's prompt action to preserve and then sell the property, and to assist

---

[1] The Trustee has indicated that he does not seek a surcharge against RDC Construction, and has paid it its allowed claim of $10,974.73.

in resolving--through litigation and ultimately settlement--the various priority disputes which entangled OSB, the mechanics' lienholders, and another junior secured creditor, WRI. As the Trustee pointed out at oral argument, no such party has contended that they were prepared to save the property from the senior lienholder's $24 million claim at any looming foreclosure sale.

After paying off the OSB debt of approximately $24 million, the Trustee now has on hand slightly under $4.3 million. Once the surcharge issue is resolved, the Trustee is prepared to distribute most of that cash to the settling secured creditors. The Trustee will be paying them pursuant to their recognized secured claims, and the Settlement Agreement that has been recently approved by this court.

To date, the Trustee has paid the senior secured creditor, OSB, approximately $24 million, and has collected from OSB a voluntary and negotiated portion of the surcharge in the amount of $240,000.

Initially, there were approximately 27 potential lien creditors who sought to benefit from the $29 million sale proceeds. (See Settlement Agreement at 1-3.) Through litigation or settlement, that number was reduced to 17. The dollar amount reduced significantly when OSB was recognized as a senior lienholder and its lien was satisfied. Then the substantial claim of RDC Construction ("RDC") was litigated to a secured figure under $11,000 and was also paid off.[2] Fifteen lien claimants with recognized secured claims remain, and they have reached an amicable settlement on how much they will receive, subject only to resolution of the unknown amount of the present surcharge request.

Under § 506(c), the Trustee must demonstrate that the expenses it seeks to surcharge against the lien claimants are reasonable, necessary, and beneficial to the secured creditors' recovery, or that the lienholders caused or consented to those expenses. *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260 (9th Cir. 2000).

The remaining lienholders dispute the Trustee's claim for a surcharge, even though they are clearly benefitting from the Trustee's efforts. They make the following arguments directed to the "reasonableness" equation: (1) the Trustee settled its surcharge request with OSB for about 1% of OSB's secured claim, and therefore they should get the same treatment, (2) that the surcharge should be directly measured by the actual expenses and professional fees of the Trustee, rather than by what they contend is

---

[2] RDC has appealed from that decision, but there is no stay pending appeal currently in effect.

an arbitrary figure, and (3) the surcharge request is not reasonable and the Trustee's efforts did not benefit them.

The objecting creditors also claim that the Trustee has failed to prove that surcharge was reasonable, necessary, and beneficial to them, and cite the Ninth Circuit's case of *In re Cascade Hydraulics and Utility Service, Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) for support.

Each argument will be discussed.

### 1. <u>Benefit to Secured Creditors</u>

There would appear to be no credible argument that the Trustee's efforts did not benefit the secured creditors. First, the creditors <u>asked</u> for the appointment of a Trustee, because they felt that the Debtor entities were incapable of financing a feasible reorganization, and that the Debtor entities could not successfully manage a reorganization case. The court granted the motion on October 2, 2006 (Dkt. #67). Thereafter, the Trustee searched for and found a buyer, which was able to close. From this effort, the secured creditors realized $29 million. Their collective claims exceed this figure. This amount was sufficient to pay off OSB, which held a senior secured debt of between $22 and $24 million, and preserve a surplus for all other junior (now surcharge-objecting) creditors, subject to resolution of their liens' validity, amounts, and priorities. But for the Trustee's involvement, it is highly unlikely that these junior creditors would have even one dollar to quibble over, much less $4.3 <u>million</u>.

The Trustee acted swiftly and wasted no time or effort in locating a buyer. Thereafter, this record is abundantly clear, especially from the adversary proceedings, that the various creditors could not reach a quick or rational solution on their own. Instead, they resorted to litigation, motions, and other legal strategies before finally, on the eve of trial, deciding that they would rather settle than wage a continuing war of attrition. The Trustee did not create nor encourage the atmosphere of litigiousness amongst the creditors, nor did he contribute to their intractable attitudes. The Trustee did not foster the antipathy nor the litigation which no doubt has cost the various lienholders substantial sums in attorneys' fees, as well as a loss of the time value of money.

Indeed, the Trustee's positive efforts to gain accord in such a negative atmosphere was constant and consistent. The Trustee's sale of the property was an absolute necessity, and on this record, he loyally maximized its monetary value for the benefit of all those who now question his request for a surcharge under § 506(c).

The facts of the *Cascade* case, on which the objecting creditors rely, are distinguishable from the instant one. In that case, the debtor remained in possession and continued to use a single bank's collateral, which consisted of goods, merchandise, and inventory. The court allowed the continued use of the bank's security pursuant to an adequate protection order and budget. Five months later, the debtor was forced to liquidate, and attempted to charge routine administrative expenses against the bank's collateral. The Ninth Circuit held that a debtor-in-possession could not do so without quantifying the benefit provided to the secured creditor during the aborted reorganization.

Our situation is far different. Here there were numerous parties with secured lien claims against the Debtors' various parcels. Here, also, the principal secured creditors <u>requested</u> the appointment of a <u>trustee</u>, for whom no viable options existed except sale of the Debtors' multi-faceted properties. The Debtors themselves made no effort to reorganize under chapter 11,[3] for the most basic of reasons--they were simply undercapitalized. The Trustee then took the only logical and necessary steps to liquidate the collateral, which he was able to do for the benefit of all of the creditors which had a secured interest in such property.

The court therefore finds that the Trustee easily met his burden of proof on whether his efforts, and those of his professionals, conferred a benefit upon the secured creditors.

## 2. Necessity

The next question is whether the Trustee's efforts were necessary to accomplish this result. A Trustee is the representative of the estate, 11 U.S.C. § 323, and is charged with a fiduciary duty to act in the best interests of all creditors. *In re Perez*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994) (citing § 1107(a)); *see*

---

[3] Despite having been in this case for 14 months, the Debtors have never filed a plan of reorganization.

*also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7-10, 120 S.Ct. 1942, 1948-49 (2000) (discussing the trustee's unique role in the bankruptcy proceedings and authority to enforce the provisions of § 506(c)). His duties include selling secured property. *See* 11 U.S.C. § 363.

No party has argued that the Trustee did not act diligently, nor that he forsook his responsibilities as the estate representative. The entire administrative file in this case supports the Trustee's decision to sell the Debtors' property, because there was no money with which to reorganize (indeed, OSB advanced funds to protect the property from vandalism, weather, and other threats), and the only option available was to find a buyer. The Trustee did that which was necessary. He found a buyer and closed the sale. Money was made available to pay the secured creditors. The Trustee made all the difference in this case, and it was positive.

A trustee was sought by the secured creditors, and he took the necessary steps to preserve, protect, and sell the valuable estate assets for the benefit of all secured creditors. The Trustee has satisfied his burden of proof on this issue.

### 3. Same Treatment as OSB

The argument that the objecting creditors, who have chosen to litigate rather than settle this surcharge issue, should be accorded the same "favorable" treatment as OSB, which agreed to settle and cut its losses, "is a short horse soon curried."[4] This argument is about proportionality.

The objecting creditors' argument fails because OSB was astute enough to recognize and take advantage of a settlement opportunity when it presented itself, while others did not. Instead, the objecting creditors elected, on this record, to litigate the surcharge issue. Therefore, OSB's settlement is not the measurement of what the outcome should be here. The appropriate surcharge on a $29 million sale is what is at issue, not how cheaply a particular litigant was able to settle.

This argument is unpersuasive, in that it attempts to misdirect the focus of the relevant inquiry here.

---

[4] A favorite phrase of Arizona Supreme Court Justice Levi Udall.

5

## 4. Reasonableness Versus Expenses

The reasonableness of the surcharge, according to the objecting creditors, must be tested by a day-by-day, hourly, and itemized timesheet task analysis, rather than by what they consider to be an "arbitrary" $895,000 surcharge request.

The court disagrees that this is the only proper way to arrive at the amount of the surcharge. In determining § 506(c) reasonableness, there are many ways to view such issue.

### A. The Real Estate Commission Method

The easiest method by which to measure the reasonableness of a surcharge, as to the sale of vast parcels of commercial acreage consisting of raw, partially or fully improved real estate, is to look at what a typical real estate commission would be if the Trustee had simply placed the property in the hands of qualified real estate brokers. In this court's experience, that commission alone would be ten percent (10%). On a $29 million sale, that commission figure would be $2.9 million. While the court recognizes that this percentage could perhaps have been negotiated to a lower rate, such outcome is unlikely because of the complex and various real estate holdings of these Debtors, and the immense difficulty of selling their bulk land holdings containing not only bare land, but also land containing partially built structures or those parcels with only infrastructure located thereon.

The court has no difficulty in finding that 10% would be a normal commission charged by a real estate broker in this instance. This court deals, almost daily, with real estate sales, be they residential or commercial and, even without specific evidence on the subject here, the court is comfortable that its conclusion as to what that commission would be is very close to, if not exactly on target. The Ninth Circuit has recognized that bankruptcy courts must constantly draw from, and utilize such basic commercial knowledge. In a case involving the bankruptcy judge's estimate of an interest rate, wherein a litigant challenged a bankruptcy court's decision as "arbitrary," the Circuit noted:

> To some degree that may be true. But rough estimates are better than no estimates. We are willing to rely on the expertise of the bankruptcy judge in a case such as this, particularly where no contrary evidence was introduced. A bankruptcy court should be accorded substantial deference in these matters because it has "almost daily experience with the rates charged by actual commercial lenders and other financier's [sic] of chapter 11 debtors." *In re Fi-Hi Pizza*, 40 B.R. 258, 271 (Bankr. D.Mass.1984). We uphold the bankruptcy court's judgment here.

*In re Camino Real Landscape Maintenance Contractors,* 818 F.2d 1503, 1508 (9th Cir. 1987); *see also*, FED. R. EVID. 201(b), (c) (judicial notice). The same reasoning holds true when it comes to real estate broker's commissions. In fact, it is far easier for a court to know what a broker's commission would be than to calculate "risk factors" and interest rates. *See, e.g., In re Fowler,* 903 F.2d 694 (9th Cir.1990) (interest rate analysis).

By this measure, the Trustee's requested surcharge of $895,000 on a $29 million sale is only 3%, a savings to the creditors of 70% from that of a traditional broker, who would have charged 10%. Thus, by this measure, the surcharge appears imminently reasonable.

### B. Trustee's Commission Approach

Yet another way to measure the amount of the surcharge is to consider another statute, 11 U.S.C. § 326 (a), wherein Congress provided a statutory method by which to determine a trustee's fee in a chapter 7 or chapter 11 case. Under that statute, a trustee's fee would be capped, on a $29 million sale which benefitted only secured creditors, at $893,250. The calculation is:

| Amount Disbursed to Creditor | Trustee's Fee | |
|---|---|---|
| $ 0 - 5,000 | $1,250 | (25%) |
| 5,001 - 50,000 | 4,500 | (10%) |
| 50,001 - 1,000,000 | 47,500 | (5%) |
| 1,000,001 - 29,000,000 | 840,000 | (3%) |
| | $893,250 | |

In addition, the Trustee noted that his costs to date have been $43,750, broker fees make up another $50,000, and accounting fees are approximately $20,000. All of these figures, then, add up to $1,007,000.

Here, the lienholders consented to the appointment of a trustee. Although, on all the facts, such consent might not have amounted to an implied consent to the surcharge, it is a significant factor concerning the reasonableness of including the Trustee's fee in the surcharge amount. *See, e.g., In re Bob Grissett Golf Shoppes, Inc.*, 50 B.R. 598, 609 (Bankr. E.D. Va. 1985) ("A secured creditor who knows the debtor's estate has no unencumbered assets and nevertheless moves for appointment of a trustee cannot by that means transfer to a third party, such as the trustee, the burden of financing the liquidation.").

To date, the Trustee has collected a portion of the requested surcharge, in the sum of $240,000, from OSB without a fight. He still seeks $655,000 from those remaining creditors who will share over $4 million, which sum would not otherwise have been available but for the Trustee's efforts.

But the creditors miss the point. This dispute is about the reasonableness of a 3% surcharge on a $29 million sale, not just on the $4 million which remains for distribution. The problem now faced by those remaining junior lienholders, who chose not to settle early, is that they are now in the unenviable legal position of having to pay proportionately more. But that is simply a consequence of litigation, and choosing to present the case for a court's decision.

Therefore, were the court to measure the requested surcharge just by looking at the Trustee's statutory maximum fee, plus his expenses, the surcharge would be in the range of $1,007,000.

Therefore, by this measure, the requested surcharge of $895,000 is reasonable.

### C. The Timesheet Method

As the objecting creditors suggest, a third acceptable method in determining the appropriate surcharge is to measure the actual time spent on a particular project, and thus, by use of a "lodestar," multiply the hours spent by an hourly rate, and thereby mathematically calculate the amount of the surcharge.

Here, the objecting creditors argue that neither the Trustee nor the Trustee's counsel have submitted time-sheets, and it is therefore premature to allocate a surcharge without that information.

The court disagrees, because even without specific timesheets, the reasonableness of the surcharge amount can be measured in other ways, as noted above.

As previously analyzed by either the broker commission or trustee fee methods, without even considering the Trustee's attorneys' time or tasks, a surcharge is suggested as ranging between $1,007,000 to $2,900,000. Were the court to also factor in the attorneys' time, the lesser figure of $1,007,000 would only increase.

The court finds that it is neither necessary nor required, at this time, to adjudicate the attorneys' time spent on this aspect, because doing so would not appreciably change the outcome, or if it did change it, the surcharge would move up, not down.

The issues surrounding the ultimate reasonableness of the Trustee's fee and his attorneys' fees will not be decided by this motion or this decision. This decision today only addresses the reasonableness of the requested surcharge. The issues concerning the final compensation to the estate's professionals, including the Trustee's fee, will be left to another day. If those fee requests are reduced below $895,000, then any leftover pool of money can be possibly subject to a secondary distribution to the objecting secured creditors.

But for today, the court finds that the surcharge is reasonable.

## CONCLUSION

The surcharge request is for $895,000. This figure is .0308% of the $29 million sale figure, and lower than a real estate commission by over two-thirds. It is also lower than the statutory trustee's fee and costs to date (excluding attorneys' fees). The Trustee and his counsel did not employ a realtor on a normal listing basis, which for commercial real property would generally create a claim for a 10% commission. For a $29 million sale, that figure would have been $2.9 million. The Trustee's surcharge request knocks 70% off of that number.

Clearly, the Trustee's efforts and those of his professionals made a substantial difference in the ultimate amounts now available for distribution to the secured creditors, who likely would have been left with nothing but for his efforts.

After considering the pleadings, the law, and the facts of this entire case, the court finds that the requested total surcharge of $895,000 is fair, reasonable and of great benefit to the secured creditors,

9
Case 4:06-bk-00961-JMM    Doc 311    Filed 11/01/07    Entered 11/02/07 08:02:29    Desc
Main Document    Page 9 of 12

1 because, but for the Trustee's efforts, this estate's value to the secured creditors, especially those junior to
2 OSB, would most likely have been lost.  The Trustee's settlement with OSB for $240,000 does not alter the
3 finding that the $895,000 total surcharge is fair, reasonable, and appropriate.

4         Therefore, the court finding that the surcharge is appropriate, reasonable, has conferred a
5 benefit on the secured creditors, the court will enter an order granting the Trustee's motion in the amount
6 of $895,000, and overruling the objections to the Trustee's motion.

8         DATED AND SIGNED ABOVE.



COPIES served as indicated below on the date signed above:

| | |
|---|---|
| Adam B. Nach, Allison M. Lauritson and Lisa Banen<br>Lane & Nach, P.C.<br>2025 N. Third St., #157<br>Phoenix, AZ 85004<br>Email: adam.nach@azbar.org,<br>allison.lauritson@lane-nach.com, lisa.banen@lane-nach.com<br>Attorneys for A Company Portable Restrooms | Daniel P. Collins and Margaret A. Gillespie<br>Collins, May, Potenza, Baran & Gillespie<br>2210 Chase Tower, 201 N. Central Ave.<br>Phoenix, AZ 85004-0022<br>Email: dcollins@cmpbglaw.com<br>Email: mgillespie@cmpbglaw.com<br>Attorneys for Robert P. Abele, Trustee |
| William J. Simon<br>Tiffany & Bosco<br>2525 E Camelback Rd., #300<br>Phoenix, AZ 85016-4237<br>Email: jal@tblaw.com<br>Attorneys for Alliance Lumber and Kay Construction | Don C. Fletcher<br>The Cavanagh Law Firm<br>1850 N. Central Ave., #2400<br>Phoenix, AZ 85004<br>Email: dfletcher@cavanaghlaw.com<br>Attorneys for Plaintiff BCI Bebout Concrete |
| James F. Wees<br>Wees Law Firm<br>2600 N. Central Ave., # 635<br>Phoenix, AZ 85004<br>Email: james@weeslawfirm.com<br>Attorneys for Chas Roberts Air Conditioning | Carolyn J. Johnsen<br>Jennings, Strouss & Salmon, P.L.C<br>The Collier Center, 11th Floor<br>201 E. Washington St.<br>Phoenix, AZ 85004-2385<br>Email: cjjohnsen@jsslaw.com<br>Attorneys for Del Martenson Development |
| Michael C. Zukowski and Ernest Collins, Jr.<br>Beaugureau, Zukowski & Hancock, P.C.<br>2111 E. Highland Ave., #255<br>Phoenix, AZ 85016<br>Email: mzukowski@bzhlaw.com, ecollins@bzhlaw.com<br>Attorneys for Diversified Roofing | Rodger A. Golston<br>Golston Keister & Steen, P.C.<br>4500 S. Lakeshore Dr., #570<br>Tempe, AZ 85282-7057<br>Email: rag@gkshlaw.com<br>Attorneys for Gale Contractor Services |
| William Novotny and Robert A. Shull<br>Mariscal, Weeks, McIntyre & Friedlander<br>2901 N. Central Ave., #200<br>Phoenix, AZ 85012-2705<br>Email: william.novotny@mwmf.com,rob.shull@mwmf.com<br>Attorneys for Integrated Stucco | John D. Parker, II<br>Parker Law Firm, PLC<br>141 E. Palm Ln., #111<br>Phoenix, AZ 85004<br>Email: jparker@ptlaw.net<br>Attorneys for Jordan Company |
| James H. Hazlewood<br>Carpenter, Hazlewood, Delgado & Wood PLC<br>1400 E. Southern Ave., #640<br>Tempe, AZ 85282<br>Email james.hazlewood@carpenterhazlewood.com<br>Attorneys for Maricopa Meadows Homeowners Association | Robert P. Harris<br>Quarles & Brady LLP<br>Two N. Central Ave., #200<br>Phoenix, AZ 85004<br>Email: rharris@quarles.com<br>Attorneys for Mitchell Electric |
| Joshua W. Wolfshohl<br>Porter & Hedges LLP<br>1000 Main St., 36th Floor<br>Houston, TX 77002<br>Email: jwolfshohl@porterhedges.com<br>Attorneys for Mitchell Electric | Howard C. Meyers<br>Burch & Cracchiolo, P.A.<br>702 E. Osborn, #200<br>Phoenix, AZ 85014<br>Email: hmeyers@bcattorneys.com<br>Attorneys for New Century Holdings |

| | |
|---|---|
| Gregory P. Gillis<br>Jaburg & Wilk PC<br>14500 N. Northsight Blvd., #116<br>Scottsdale, AZ 85260<br>Email: gpg@jaburgwilk.com<br>Attorneys for Pacific Pools and Spas | Steven M. Cox<br>Waterfall Economidis Caldwell Hanshaw & Villamana,<br>5210 E. Williams Cir., #800<br>Tucson, AZ 85711<br>Email smcox@wechv.com<br>Attorneys for RDC Construction |
| Christopher J. Berry<br>Berry and Associates<br>101 N. First Ave., #1800<br>Phoenix, AZ 85003<br>Email: cberry@berryandassoc.com<br>Attorneys for Riggs Plumbing | Bradley Pack<br>Engelman Berger, PC<br>3636 N. Central Ave., Suite 700<br>Phoenix, AZ 85012-1936<br>Email: bpack@courts.sp.state.az.us |
| Ryan Christopher Skiver<br>Britt Law Group PC<br>2525 E. Camelback Rd., #900<br>Phoenix, AZ 85016<br>Email: rskiver@brittlawgroup.com<br>Attorneys for Triple S Fence Co. | Gary V. Ringler<br>7303 W. Boston St.<br>Chandler, AZ 85226<br>Email: garyvringler@earthlink.net<br>Attorneys for Trussway, Inc. West |
| Steve A. McQueen<br>Pagel, Davis & Hill, P.C.<br>1415 Louisiana, 22nd Floor<br>Houston, TX 77002<br>Email: dam@pdhlaw.com<br>Attorneys for Trussway, Inc. West | Ari Ramras<br>Ramras Law Office, P.C.<br>5060 N. 40th St., #103<br>Phoenix, AZ 85018<br>Email ari@ramraslaw.com<br>Attorneys for WRI Investments and Ohio Savings Bank |
| Joseph E. Cotterman, Jaclyn D. Malka, Thomas A. Maraz<br>Gallagher & Kennedy, P.A.<br>2575 E. Camelback Rd.<br>Phoenix, AZ 85016-9225<br>Email: jec@gknet.com, jaclyn.malka@gknet.com,<br>tam@gknet.com<br>Attorneys for WRI Investments, Ohio Savings Bank | Scott B. Cohen<br>Sacks Tierney P.A.<br>4250 N. Drinkwater Blvd., 4th Flr.<br>Scottsdale, AZ 85251<br>Email: Scott.Cohen@SacksTierney.com<br>Attorneys for WRI Investments III |
| Kevin J. Blakley Email: kblakley@gblaw.com<br>Gammage & Burnham, P.L.C.<br>Two N. Central Ave., 18th Floor<br>Phoenix, AZ 85004<br>Attorneys for Ohio Savings Bank | Office of the United States Trustee<br>230 North First Avenue, Suite 204<br>Phoenix, AZ 85003-1706<br>U.S. Mail |
| Cary S. Forrester Email: S.Forrester@azbar.org<br>Forrester & Worth, PLLC<br>3636 North Central Avenue, Suite 700<br>Phoenix, AZ 85012-1927 | Alan A. Meda Email: ameda@stinsonmoheck.com<br>Stinson Morrison Hecker, LLP<br>1850 N. Central Ave., Suite 2100<br>Phoenix, AZ 85004-4584 |

By /s/ M. B. Thompson
    Judicial Assistant

*SIGNED* (watermark)